AO 91 (Rev. 11/11) Criminal Complaint                    AUSA Sunil R. Harjani (312) 353-9353

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

UNITED STATES OF AMERICA

v.

HENRY MEYER

CASE NUMBER:
**UNDER SEAL**

**FILED**
4-4-16
APR 0 4 2016

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

16CR 227

## CRIMINAL COMPLAINT

MAGISTRATE JUDGE FINNEGAN

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

From in or about August 2011 through in or about March 2016, in the Northern District of Illinois, Eastern Division, and elsewhere, the defendant HENRY MEYER engaged in the following violations:

**Count One**: Defendant engaged in a scheme to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, promises and concealment of material facts, and, for the purpose of executing such scheme, sent and caused the sending of a mailing by commercial interstate carrier, namely documents describing defendant's fraudulent investment program sent via UPS, on or about November 16, 2012, in violation of Title 18, United States Code, Section 1341;

**Count Two:** Defendant engaged in a scheme to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, promises and concealment of material facts, and, for the purpose of executing such scheme, transmitted and caused the transmission of an interstate wire communication, namely an interstate wire transfer of $125,000, on or about November 26, 2012, in violation of Title 18, United States Code, Section 1343.

This criminal complaint is based upon these facts:

  X   Continued on the attached sheet.

_____
MARK STAKEM
Special Agent, Federal Bureau of Investigation
(FBI)

Sworn to before me and signed in my presence.

Date: _____4-4-2016_____

_____
*Judge's signature*

City and state: <u>Chicago, Illinois</u>

<u>Sheila Finnegan, U.S. Magistrate Judge</u>
*Printed name and Title*

## AFFIDAVIT

I, Mark D. Stakem, being duly sworn, state as follows:

1.      I am a Special Agent with the Federal Bureau of Investigation, and have been so employed for 17 years. My current responsibilities include the investigation of white collar crime, including mail, wire and bank fraud. During that time, I have conducted numerous financial fraud investigations and have obtained and served numerous search warrants, and conducted searches, in financial fraud investigations. At this time, I am assigned to an FBI squad dedicated to the investigation of federal wire and mail fraud offenses, as well as related financial crimes.

2.      This affidavit is submitted in support of a criminal complaint and applications for the issuance of search warrants. Because this affidavit is being submitted for the limited purpose of establishing probable cause for the criminal complaint and search warrant applications, I have not included each and every fact known to me concerning this investigation. This affidavit is based on my personal knowledge, information provided to me by other law enforcement agents, my review of subpoenaed records, interviews of witnesses, and my training and experience, among other things.

3.      This affidavit is made for the limited purpose of establishing probable cause to support: (A) a criminal complaint to be issued in the Northern District of Illinois alleging that, from in or about August 2011 and continuing through in or about March 2016, HENRY MEYER engaged in a scheme to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, promises and concealment of material facts, and, for the purpose of executing such scheme, used and the caused the use of a commercial interstate carrier and interstate wire transfer, in violation of Title 18, United States Code, Sections 1341

1

(mail fraud) and 1343 (wire fraud); (B) an application for the issuance of a warrant in the Northern District of Illinois to Comcast, headquartered at 650 Centerton Road, Moorestown, NJ 08057, to search MEYER's email account, henryprospect1@comcast.net (the "**Subject Account**"), for evidence of violations of Title 18, United States Code, Sections 1341 and 1343; and (C) an application for the issuance of a warrant in the Southern District of Florida to search MEYER's residence at 333 Aragon Ave., Apt. 809, Coral Gables, Florida 33134 (the "**Subject Premises**"), for evidence of violations of Title 18, United States Code, Sections 1341 and 1343.

4.      As further stated below, there is probable cause to believe that MEYER has engaged in a scheme to defraud his clients for over 4 years through false statements and representations about his investment of his clients' funds.  Specifically, there is probable cause to believe MEYER, who managed at least $5 million of client funds, falsely represented that his clients' funds were invested in a European investment program and was highly profitable, when MEYER had actually spent a portion of those client funds on his own personal expenses and lost a substantial portion of the remaining funds due to investment losses.  To date, there is probable cause to believe that MEYER has lost at least $4 million of clients' investment funds.

### Background

5.      As set forth below, MEYER's scheme involved soliciting investment funds from at least three investors totaling at least $5 million starting in or about August 2011.  Through his company, HCM Asset Management LLC, MEYER offered these investors an investment opportunity that he called the "European Derivative Investment Program."  The success of the Derivative Program was purportedly related to the failure of the European economies of Portugal, Ireland, Italy, Greece and Spain (PIIGS).

6.     On or about January 25, 2016, I was made aware of MEYER's investment program by family members of Investor A, who resides in the Northern District of Illinois. Investor A is approximately 79 years old, and family members were concerned about Investor A's investment of funds with MEYER.  The family members had recently reviewed documents relating to Investor A's investment in the Derivative Program, and the family provided them to me for my review.

### Information Obtained Concerning Investor A's Investment with MEYER

7.     I have reviewed documents provided to me by Investor A's family.   The documents show that, between in or about August 2011 and in or about September 2014, MEYER caused Investor A to invest a total of over $2.4 million in the Derivative Program.

8.     After Investor A had invested over $1.3 million with MEYER's Derivative Program, in or about November 2012, MEYER sent a package of information to Investor A in the Northern District of Illinois via United Parcel Service (UPS) on or about November 16, 2012. In this packet, MEYER provided an update of the Derivative Program, stating the German exchange authorities granted a 9-month "extension" of the "winning derivatives" which were the investments in MEYER's program.   MEYER discussed the continued success of the Derivative Program as long as the PIIGS were in economic distress.  MEYER claimed the "winning teams" in the Derivative Program lobbied the U.S. Federal Reserve and German exchange authorities to get this extension.

9.     As part of this purported extension, MEYER wrote a "mini-enhancement" was available to the winning derivatives positions.  MEYER stated, "This mini-enhancement will cost $225K to complete," and MEYER asked Investor A for a $125,000 additional investment in the Derivative Program.  MEYER stated, "the $125K will fall under our overall agreement of a

net 50% on funds in addition to the derivatives payout." MEYER also sent Investor A internet articles about European debt and economic performance of certain countries in Europe as part of the November 2012 UPS package.

10. Also, in the November 2012 UPS package, MEYER sent Investor A a letter, in which MEYER swore Investor A to privacy regarding the Derivative Program. MEYER stated, "[A]n investment manager achieving a spectacular result in a relatively short period of time brings with it many problems," including, "people are going to be very upset that they were not included in this position," and the "winning derivatives position…will produce tremendous resentment towards me." MEYER wrote, "Please don't broadcast my name about with regard to this position and it's (sic) high return."

11. After receipt of the November 2012 UPS package, according to documents provided by Bank of America, Investor A provided MEYER over approximately $1,000,000 of additional investments in the Derivative Program via wire transfer from Investor A's account in Illinois to MEYER in Florida.

12. In or around the Fall of 2013, according to Family Member A, h/she and others contacted MEYER telephonically. During this conversation, MEYER told Family Member A that the European Derivative program was successfully ending, but there was a clerical error made during the closing process, and the funding would be delayed approximately three to six months into 2014. In other words, MEYER told Family Member A that Investor A would be paid investment principle plus profit from the Derivative Program later in 2014.

13. MEYER told Family Member A there would be no reason for any additional delays beyond 2014 in the funding process of the European Derivative program. According to Family Member A, MEYER was glib and condescending during this telephone call. Family

Member A asked MEYER to explain the Derivative Program. MEYER told Family Member A he could not because it would be like trying to teach Family Member A the Chinese language. MEYER referenced that the Derivative Program was a friend and family investment. Family Member A mentioned that Bernie Madoff defrauded his family, but MEYER did not respond.

14. According to Family Member A, h/she learned that in March 2015, while Investor A and Investor A's spouse were in Florida, they met MEYER and MEYER took them out to dinner. Investor A's spouse stated that MEYER asked for additional principal investments in the Derivative Program. MEYER told Investor A and the spouse during dinner that once the Greek bailout was resolved during 2015, Investor A and the spouse would receive their investment principal plus profit.

15. Family Member A explained to me that on occasion, MEYER's father, who resided in Illinois, acted as a liaison between MEYER and MEYER's investors, due to his physical proximity to MEYER's investors. This liaison activity included MEYER's father delivering documents MEYER faxed to MEYER's father to the investors.

16. Documents provided to me by Family Member A included a July 20, 2015 letter from MEYER to Investor A and MEYER's father. In this document, MEYER stated, "Our position was setup in 2009 to take full advantage of an economic collapse in the weaker countries of western Europe, the PIIGS. These positions were designed to grow rapidly on negative economic and bond market data from these countries." MEYER referenced 2012 and the PIIGS going into "severe recession. Which made it great for our positions." MEYER also discussed German exchanges and their role in the Derivative Program. MEYER stated, "What makes the Germans special is they offer a full guarantee on payment. The guarantee on payment

means the exchange will cover the part of the loses (sic) the losing party cannot pay to the winning party due to bankruptcy."

17. Other documents provided to me by Family Member A included a letter from MEYER to Investor A in October 2015. In the letter, MEYER stated, "I am the smallest partner in the group. However, I have certain expertise in financial derivatives that the group values and is relying on for the unwind process. That is my leverage in this situation...my expertise in exchange for certain demands that I want. MEYER also wrote about the large European outfits reducing taxes to increase profit. MEYER states, "For us...a few $million that at this point I don't care about." MEYER also stated, "I did more than my workload throughout this year on the position."

18. Other documents provided to me by Family Member A included two letters from MEYER to Investor A and Investor A's family in late December 2015. In the documents, MEYER wrote the Derivative Program had a "partnership with several major European investment firms." The documents stated that by the end of March 2016, "a majority of the unwinding and related tax work will be complete by the combined group." The documents further stated, "the German authorities placing a good deal of pressure on them now to get on with it." Additionally, the documents stated, "This project has been extremely successful and you will understand that in a very short period of time." Finally, the documents stated, "Nothing, absolutely nothing externally can affect the funds and the payout."

19. Another document provided to me by Family Member A included a "Private Letter" from MEYER to Investor A in late December 2015. In the letter, MEYER wrote, "the monies that you will receive very shortly will provide you with almost unlimited opportunities for the rest of your life." "The March 31st date is a lock...that is firm, set in stone...done." The

letter indicated MEYER was going to pay Investor A $20,000 a month as an advance on payment of proceeds from the Derivative Program. MEYER addressed the fact that Family Member A was skeptical of the Derivative Program by stating, "with regard to your family, please do your very best to alleviate that situation." "If something foolish is done…everything will be confiscated and no money will ever see the light of day." MEYER concluded by stating, "I am working day and night for the betterment of your family…I have done so for the past four years."

20.　　In early 2016, according to documents I received from Family Member A, MEYER provided a signed, notarized promissory note, dated January 4, 2016, to Investor A stating he will pay Investor A $10,000,000 no later than March 31, 2016. MEYER also stated in the promissory note he would pay Family Member A $2,500,000 no later than March 31, 2016.

### Information about Investors B and C

21.　　In or around 2015, according to Family Member A, h/she went through some of Investor A's financial files. Family Member A learned that a business acquaintance of Investor A, Investor B, and a family member of MEYER, Investor C, had also invested with MEYER. Investor B resides in the Northern District of Illinois. According to these documents, Investor B invested $200,000 with MEYER and Investor C invested at least $75,000 with MEYER.

22.　　According to documents I received from Family Member A, MEYER wrote a letter to Investor B in late December 2015. In the letter, MEYER wrote, "the project came to a very successful conclusion in the fall of this year and is now in the process of deconstruction. High level derivatives are extremely complex financial instruments and require a great deal of work and time to dismantle. In this project, I partnered with several large European investment firms. This was allowed by the German exchange authorities who oversee the position and thus

the option to use the 2016 tax year was taken by our combined group." MEYER further wrote, "Your principle and profit will be received by that date (March 31, 2016)." MEYER further wrote the project involved "European outfits from three different countries."

23.    According to documents provided to me by Family Member A, there is a reference to Investor C in a letter from MEYER to "Dad" dated "End of May." In the letter, MEYER wrote, "I have sent an update to [Investor C] arriving Monday. Within that update, I offered [Investor C] a small opportunity to increase [Investor C's] funding a little more with a big increase in his payout."

24.    In other documents provided to me by Family Member A, there is a letter, dated October 2015, from MEYER to Investor C and an individual who is likely Investor's C's spouse. In the letter, MEYER wrote, "our position…finally is closed and coming due this year. I will get the first funds out to you as soon as possible given the intricacies of the closing process. Right now, I am looking at the time frame between Thanksgiving and Christmas for the disbursal of major funds." MEYER also wrote, "I am going to deliver funds far above expectations to the point that they will be significant to your children and grandchildren."

### Preliminary Financial Analysis

25.    In late 2015, after Family Member A told MEYER's father h/she was going to report MEYER to the FBI, Family Member A received two $20,000 checks and a $10,000 check from MEYER. These checks were written off of MEYER's checking account at Bank of America, account number ending in 5056.

26.    I have reviewed records from MEYER's Bank of America account number ending in 5056 for the time period January 2011 through February 17, 2016. MEYER opened this account in 1995, and he is its sole signatory. In January 2011, MEYER's Bank of America

account had an average account balance of a few thousand dollars. Moreover, there is no evidence that MEYER had any payroll checks deposited to his account during the 2011 through February 2016 time period. However, MEYER used funds from this account, which as stated below was investor funds, to pay personal expenditures, including credit card bills, rent, utilities, credit and check card purchases, and to withdraw cash.

27. In MEYER's Bank of America records from January 2011 through February 2016, I observed MEYER received around $5.9 million from Investor A, Investor B, Investor C and other possible investors. MEYER sent approximately $4.3 million to TD Ameritrade, while using most of rest of the funds for personal expenditures, including over $1 million payable to American Express for credit card purchases. I have reviewed a preliminary production of records from American Express for MEYER's credit card purchases from June 2015 through December 2015. Those records show that MEYER used his American Express credit cards for personal expenditures and there was no evidence of any funds that went towards a Derivative program. In 2014 and 2015, MEYER used funds from the Bank of America account for dental and dermatological work, and for payments to a Cadillac dealer in Miami.

28. MEYER's Bank of America account had a balance of approximately $1,200 on or about April 24, 2014. On that day, MEYER deposited a $200,000 check from Investor B into the Bank of America account. Over the next approximately 2 months, MEYER wire transferred $105,000 of Investor B's funds to TD Ameritrade, and used another approximately $70,000 of the funds for personal expenditures.

29. I have reviewed records from MEYER's TD Ameritrade account number ending in 9700 for the time period January 2011 through February 2016. During this time period, this account received approximately $4.3 million in deposits from MEYER's Bank of America

account, which consisted of funds from Investors A and B and other possible investors. MEYER's trading activity consisted almost exclusively of the purchase of call options[1] of a security named Direxion Daily Financial Bear 3x shares (FAZ). According to a publicly available website of the Direxion, FAZ seeks daily investment results based on the inverse or opposite performance of the Russell 1000 Financial Services Index, and seeks a daily return of + 300% or -300% of the return of the benchmark for a single day. According to this website, the Russell 1000 Financial Services Index is an index that measures the performance of securities classified in the financial services sector of the large cap U.S. equities market. Because FAZ's performance is linked to the performance of an index based on a sector of the U.S. large cap market, there is no direct correlation between this security and any European derivative program, PIIGs, or German authorities.

30.     There is also no indication in MEYER's TD Ameritrade trading records that MEYER ever sent any money to Europe for any type of Derivative Program. The account did not have any international wire transfers during the January 2011 through February 2016 time period. Also, MEYER did not directly invest in any European futures or options, which could be classified as European-based derivative investments.

31.     MEYER's FAZ option trades were also consistently unprofitable. Over the time period January 2011 through February 2016, MEYER's trades had unrealized losses in 59 of the 62 months. Even in months when trading had unrealized gains, MEYER failed to capture these

---

[1] An option is a financial derivative that represents a contract sold by one party to another party. The contract offers the buyer the right, but not the obligation, to buy (call) or sell (put) a security or other financial asset at an agreed upon price, called the strike price, during a certain period of time or on a specific date, called the exercise date. For example, an option buyer believes the underlying value of a security or other financial asset will rise, allowing the buyer to purchase the underlying security or financial asset at a value lower than the market value and then sell it for a profit. An option buyer must pay the seller a premium for the right to buy the underlying security or financial asset, and the premium is non refundable. If the security or financial asset is not purchased by the exercise date, the option expires worthless.

gains by selling the options, and the options lost value in the subsequent month(s). Nearly all of the FAZ options purchased by MEYER expired worthless on their expiration date.

32. The value of MEYER's FAZ options in the TD Ameritrade account as of February 29, 2016 was approximately $838,000. Should MEYER continue his pattern of trading, more than half of this balance will disappear on April 15, 2016 when MEYER's FAZ options expire.

33. After reviewing all documents I received to date in this investigation, it appears that MEYER had no "winning derivatives" or "spectacular result(s)" as of November 2012. MEYER lost several hundred thousand dollars trading FAZ in 2011, a couple hundred thousand dollars more trading FAZ from January 2012 through October 2012, and as of November 2012, MEYER had unrealized losses of approximately $559,000.

34. After reviewing all documents I received to date in this investigation, there is no indication German authorities were involved in or allowed MEYER's trading in any way because he was simply buying call options through a common trading website – TD Ameritrade, which based on my training and experience, is available to almost any investor in the United States. Additionally, MEYER's trading did not come to a "successful conclusion" in the Fall of 2015, nor was it a "successful private investment project" because by the end of October 2015, MEYER had lost nearly $3 million in trading and had in excess of $400,000 in unrealized losses. Based on the funds remaining in MEYER's Bank of America and TD Ameritrade accounts, it is not financially possible that there is "full guarantee on payment" to any of MEYER's investors based on their principle investments because MEYER's Bank of America account had a balance of approximately $1,657 on February 17, 2016, and MEYER's TD Ameritrade account had a cash balance of approximately $319 and trading positions valued at approximately $838,000 on

February 29, 2016. Finally, based on the February 29, 2016 value of MEYER's Bank of America and TD Ameritrade accounts, it will not be possible for MEYER to repay Investor A and Family Member A a combined $12.5 million on March 31, 2016.

35.    On or about March 29, 2016, MEYER sent Family Member A an email from the **Subject Account**. In the email, MEYER provided explanations as to why the March 31, 2016 deadline for payment to Investor A and Family Member A would not be met. MEYER wrote, "[I]t will take an extra 14 to 21 days for me to fulfill my agreement with [Investor A]. This is due to the tremendous workload and complexities involved with this project." MEYER also wrote, "There is no need to initiate problems at this point in time…right at the finish."

36.    On or about March 31, 2016, Family Member A sent an email to the **Subject Account**. In the email, Family Member A requested that MEYER email Family Member A and Investor A a copy of a bank statement verifying that MEYER had sufficient funds in his account to cover payment to Investor A. As of April 4, 2016, MEYER did not respond to this request by Family Member A.

## Use of Wires and Mails

37.    There is probable cause to believe that MEYER used or cause the use of interstate wire transfers and the mails in carrying out the scheme to defraud.

38.    MEYER sent a UPS envelope from Florida, containing the false statement that MEYER's Derivative Program had "winning derivatives," to Individual A in Illinois on or about November 16, 2012. Family Member A provided this UPS envelope and its contents to me in February 2016.

39.    According to a copy of an electronic mail provided to me by Family Member A, on or about January 22, 2016, MEYER emailed Family Member A, utilizing **the Subject**

**Account**, stating he was going to send a package of information to Investor A via UPS. Family Member A told me that on or about January 26, 2016 Investor A received a UPS mailing from MEYER. Investor A in turn mailed a second copy of what MEYER provided Investor A to Family Member A. Contained within the three page document was a notarized document, signed by MEYER, summarizing Investor A's approximate $2.4 million investment in what MEYER described was a "successful private investment project." The document also stated, "These enhancements and extensions," [in the Derivative Program] "along with their associated exchange fees, are what your funds along with others were used for over the past years." From my training and experience, and from the description of UPS on its publicly available website, I know that UPS is a commercial carrier operating throughout the United States.

40.   On or about November 26, 2012, Investor A wire transferred $125,000 from Investor A's account at JP Morgan Chase Bank to MEYER's account at Bank of America. According to Bank of America records, this wire was sent through the Federal Reserve Wire Transfer network. From my prior review of records provided by the Federal Reserve, I know that the wire transfer that occurred through the Federal Wire Transfer network on or about November 26, 2012 was a wire transfer that was interstate.

**Request for the Issuance of a Criminal Complaint in the Northern District of Illinois**

41.   Based upon the foregoing information, there is probable cause to believe that, beginning in or about August 2011 and continuing until in or about March 2016, MEYER devised, intended to devise and participated in a scheme to defraud, and to obtain money and property, by means of materially false and fraudulent pretenses, representations and promises, and by concealment of material facts, and for the purpose of executing that scheme, and attempting to do so, used and caused to be used interstate wire transfers and a commercial

interstate carrier. In particular, for the purpose of executing the scheme to defraud, and attempting to do so, on or about November 16, 2012, MEYER knowingly caused to be transmitted by means of a mailing via UPS from MEYER to Investor A containing false representations about the success of the European Derivative Investment Program, in violation of Title 18, United States Code, Section 1341 (Count One). In addition, for the purpose of executing the scheme to defraud, MEYER knowing caused a wire communication in interstate commerce on or about November 26, 2012, namely, an interstate wire transfer of $125,000 from Investor A's Bank account ending in 0707 to MEYER's account at Bank of America ending in 5056, in violation of Title 18, United States Code, Section 1343 (Count Two).

### Request for the Issuance of a Search Warrant on the Subject Account in the Northern District of Illinois

42.     There is also probable cause to believe that evidence of a violation of Title 18, United States Code, Sections 1341 and 1343, as further described in Attachment A-1 will be located in the **Subject Account**, as further described in Attachment A-1.

43.     I have reviewed emails provided to me by Family Member A, as further described below. On or about January 22, 2016, MEYER sent an email from the **Subject Account** to Family Member A in Illinois. In the email, MEYER stated he would be sending a UPS package to Investor A on or about January 25, 2016. MEYER's email stated the "project is now coming to it's (sic) successful conclusion" and "[t]he recently signed agreement with [Individual A] will be met by March 31st." Based on the evidence discussed above, MEYER had already misappropriated a portion of Investor A's funds and lost a substantial portion of the remaining funds by the time of this email.

44.     Family Member A sent MEYER an email to the **Subject Account** on or about March 2, 2016. In the email, Family Member A inquired about the logistics of the $2.5M wire

transfer MEYER promised Family Member A by March 31, 2016. The email was successfully sent to MEYER, but as of March 16, 2016, MEYER had not responded to the email.

45.     Family Member A sent MEYER an email to the **Subject Account** on or about March 16, 2016. Family Member A copied MEYER's father on the email. In the email, Family Member A inquired again about the logistics of the wire transfer MEYER promised Family Member A and Investor A by March 31, 2016. The email was successfully sent to MEYER. MEYER's father responded that MEYER said he would be mailing checks, representing payouts from the Derivative Program, to Family Member A and Investor A on March 31, 2016.

46.     On or about March 24, 2016, I had a conversation with a family member of MEYER, Family Member B. During this conversation, Family Member B informed me that MEYER communicated by email to inform investors about the Derivative Program.

47.     In response to a subpoena issued to Comcast, Comcast confirmed the **Subject Account** was registered to HENRY C MEYER at the **Subject Premises** since at least January 2011.

48.     Based upon my training and experience in serving search warrants, and the training and experience of law enforcement officers with whom I have spoken, I am aware that individuals who run investment businesses use electronic mail to communicate with investors. This financial information can include information related to names of clients, client account statements, bank statements, brokerage statements, correspondences with clients, and statements about total assets under management for each client. Similarly, based upon my training and experience, I am aware that individuals often send over electronic mail information about their personal finances, which can include personal bank account statements, personal brokerage statements, personal mortgage statements, and records relating to assets and liabilities and

personal income and expenditures of funds.

### Search Procedure for the Subject Account

49.     In order to facilitate seizure by law enforcement of the records and information described in Attachment A, this affidavit and application for search warrant seek authorization, pursuant to 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), to permit employees of Comcast to assist agents in the execution of this warrant.   In executing this warrant, the following procedures will be implemented:

    a.     The search warrant will be presented to Comcast personnel who will be directed to the information described in Section II of Attachment A-1;

    b.     In order to minimize any disruption of computer service to innocent third parties, Comcast employees and/or law enforcement personnel trained in the operation of computers will create an exact duplicate of the information described in Section II of Attachment A-1, including an exact duplicate of all information described in Section II of Attachment A-1;

Comcast employees will provide the exact duplicate in electronic form of the information described in Section II of the Attachment A-1 and all information stored in those accounts and files to the agent who serves this search warrant; and

Following the protocol set out in the Addendum to Attachment A, law enforcement personnel will thereafter review all information and records received from Comcast employees to locate the information to be seized by law enforcement personnel pursuant to Section III of Attachment A-1.

### Request for the Issuance of a Search Warrant for the Subject Premises in the Southern District of Florida

50.     There is also probable cause to believe that evidence of a violation of Title 18, United States Code, Sections 1341 and 1343, as further described in Attachment B will be

located at the property located at the **Subject Premises**, as further described in Attachment A-2.

51.     MEYER faxed three documents relating to the Derivative Program to his father on or about December 27, 2015, which were addressed to Investor A and/or Investor A's family and, according to Family Member A, were provided to Investor A near the end of 2015.  The faxes bear a sender facsimile number of 305-446-1371 and the header "HCM." MEYER also faxed a document relating to the Derivative Program to his father on or about November 4, 2015 and December 27, 2015, addressed to Investor B, and bear a sender facsimile number of 305-446-1371 and the header "HCM."  MEYER also faxed a document relating to the Derivative Program to his father on or about October 26, 2015, addressed to Investor C, bears a sender facsimile number of 305-446-1371.   Records received from AT&T indicate this facsimile number is subscribed to the **Subject Premises**.

52.     On MEYER's account opening documents on a trading account with TD Ameritrade, MEYER lists 305-446-1371 as his facsimile number and his home address as the **Subject Premises.**  No business address or any other address is listed on the account opening documents.  All of MEYER's trading activity using funds from Investor A and Investor B was completed utilizing the TD Ameritrade account.    Moreover, every TD Ameritrade monthly account statement that I have reviewed between 2011 and 2016 is addressed to the **Subject Premises**.

53.     According to the website http://listings.findthecompany.com, MEYER is the Principal of HCM Asset Management LLC (HCM).  On this website, HCM's address is the **Subject Premises**.  It does not appear HCM has a website or a business address.

54.     On or about March 24, 2016, I had a conversation with Family Member B about the **Subject Premises**.  Family Member B advised me MEYER operated the Derivative Program

and trading related to the Derivative Program from **Subject Premises.**

55.     As further discussed below, MEYER used an email account (the **Subject Account**) to communicate with Family Member A about Investor's A Derivative Program investment.  In response to a subpoena issued to Comcast, Comcast confirmed this account was registered to HENRY C MEYER and the address associated with the account was the **Subject Premises** since at least January 2011.

56.     Based upon my training and experience in serving search warrants, and the training and experience of law enforcement officers with whom I have spoken, I am aware that individuals who run investment businesses out of their homes often keep records related to that business in their homes.  This financial information can include information in both electronic and paper form related to names of clients, client account statements, bank statements, brokerage statements, communications and correspondences with clients, and statements about total assets under management for each client.  Similarly, based upon my training and experience, I am aware that individuals often store personal records in both electronic and paper form related to their personal finances in their homes, which can include personal bank account statements, personal brokerage statements, personal mortgage statements, and records relating to assets and liabilities and personal income and expenditures of funds.

**Specifics Regarding Searches of Computer Systems at the Subject Premises**

57.     Based upon my training and experience, and the training and experience of specially trained computer personnel whom I have consulted, searches of evidence from computers commonly require agents to download or copy information from the computers and their components, or remove most or all computer items (computer hardware, computer software, and computer-related documentation) to be processed later by a qualified computer

expert in a laboratory or other controlled environment. This is almost always true because of the following:

a. Computer storage devices can store the equivalent of thousands of pages of information. Especially when the user wants to conceal criminal evidence, he or she often stores it with deceptive file names. This requires searching authorities to examine all the stored data to determine whether it is included in the warrant. This sorting process can take days or weeks, depending on the volume of data stored, and it would be generally impossible to accomplish this kind of data search on site.

b. Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert should analyze the system and its data. The search of a computer system is an exacting scientific procedure which is designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files. Since computer evidence is extremely vulnerable to tampering or destruction (which may be caused by malicious code or normal activities of an operating system), the controlled environment of a laboratory is essential to its complete and accurate analysis.

58.     In order to fully retrieve data from a computer system, the analyst needs all storage media as well as the computer. The analyst needs all the system software (operating

systems or interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard disk drives or on external media).

59.     In addition, a computer, its storage devices, peripherals, and Internet connection interface may be instrumentalities of the crime(s) and are subject to seizure as such if they contain contraband or were used to carry out criminal activity.

### Procedures to be Followed in Searching Computers at the Subject Premises

60.     The warrant sought by this Application does not authorize the "seizure" of computers and related media within the meaning of Rule 41(c) of the Federal Rules of Criminal Procedure. Rather the warrant sought by this Application authorizes the removal of computers and related media so that they may be searched in a secure environment.

61.     With respect to the search of any computers or electronic storage devices seized from the location identified in Attachment A-2 hereto, the search procedure of electronic data contained in any such computer may include the following techniques (the following is a non-exclusive list, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein):

a.     examination of all of the data contained in such computer hardware, computer software, and/or memory storage devices to determine whether that data falls within the items to be seized as set forth herein;

b.     searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth herein (any data that is encrypted and unreadable will not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offenses, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of the offenses

specified above);

    c.    surveying various file directories and the individual files they contain to determine whether they include data falling within the list of items to be seized as set forth herein;

    d.    opening or reading portions of files in order to determine whether their contents fall within the items to be seized as set forth herein;

    e.    scanning storage areas to discover data falling within the list of items to be seized as set forth herein, to possibly recover any such recently deleted data, and to search for and recover deliberately hidden files falling within the list of items to be seized; and/or

    f.    performing key word searches through all storage media to determine whether occurrences of language contained in such storage areas exist that are likely to appear in the evidence described in Attachment B.

    62.    Any computer systems and electronic storage devices removed from the premises during the search will be returned to the premises within a reasonable period of time not to exceed 30 days, or unless otherwise ordered by the Court.

**Conclusion**

    63.    Based on the above information, I respectfully submit that there is probable cause to believe that mail and wire fraud offenses, in violation of Title 18, United States Code, Sections 1341 and 1343, have been committed by MEYER, and that evidence relating to this criminal conduct will be found in the **Subject Account** and at the **Subject Premises**, and therefore respectfully request that this Court issue a criminal complaint for MEYER, a search warrant for the **Subject Account** authorizing the seizure of items described in Attachment A-1, and a search warrant for the **Subject Premises** authorizing the seizure of the items described in

Attachment B.

FURTHER AFFIANT SAYETH NOT.

_____
MARK STAKEM
Special Agent
Federal Bureau of Investigation

Subscribed and sworn before me this 4th day of April 2016, at Chicago, Illinois.

The Honorable Sheila Finnegan
United States Magistrate Judge

22